HADAMI, S.A., Plaintiff,

v.

XEROX CORPORATION, Defendant.

16 Civ. 5726 (PAE)

United States District Court,
S.D. New York.

Signed 07/19/2017

Jonathan David Plaut, Chardon Law Offices, Boston, MA, for Plaintiff.

Carolyn G. Nussbaum, Nixon Peabody LLP, Rochester, NY, for Defendant.

## OPINION & ORDER

Paul A. Engelmayer, United States District Judge

Plaintiff Hadami, S.A. ("Hadami") brings this lawsuit against defendant Xerox Corporation ("Xerox") for breach of contract, breach of the implied covenant of good faith and fair dealing, gross negligence, fraud, and tortious interference with prospective economic advantage. Hadami, a Paraguayan corporation, claims that it entered into an agreement with Xerox, a New York corporation, under which Hadami would be one of two exclusive resellers of Xerox light office machines in Paraguay. However, Hadami claims that Xerox breached their agreement, committed fraud, and injured Hadami when it supported Hadami's competitors operating in Paraguay's "grey market."

Xerox now moves to dismiss. It argues, under Federal Rule of Civil Procedure 12(b)(6), that Hadami's allegations fail as a matter of law and that Hadami fails to allege fraud with the required level of particularity. For the following reasons, the motion is granted in part and denied in part.

## I. Background

### A. Factual Background[1]

#### 1. Relationship between Hadami and Xerox

In or about 2009, Fabian Portilla, then Director of Xerox's General Market Operations Supply & Paper Division, approached Won Ki Chung about a business opportunity in Paraguay. FAC ¶¶ 6-7. For the prior 15 years, Chung had owned Don Lorenzo, a Paraguayan company that resold computer components and light office machines made by various manufacturers. *Id.* ¶ 5. Portilla, impressed with Chung's operations, asked Chung if he would be interested in starting a new company focused on reselling Xerox products. *Id.* ¶ 7. Chung initially saw no reason to limit his

---

1. The facts are drawn primarily from Hadami's First Amended Complaint, Dkt. 11 ("FAC"), and its attached exhibits. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). In deciding the motion to dismiss, the Court accepts all factual allegations in the FAC as true and draws all reasonable inferences in Hadami's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

For the purposes of this motion, the Court considered many, though not all, documents presented by Hadami as exhibits to the Affidavit of Jose Entin, Esq. Dkt. 22. ("Entin Aff."). "Even where a document is not incor-

porated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotations omitted). Many of these exhibits are emails and letters directly referenced by the FAC. These contain communications that form the basis of Hadami's claims and are thus "integral to the complaint" and cognizable. To the extent the Court considered such cognizable materials, they are cited below. The Court did not, however, consider new facts contained in the Entin Affidavit or Hadami's opposition brief, because "it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss," *Jordan v. Chase Manhattan Bank*, 91 F.Supp.3d 491, 500 (S.D.N.Y. 2015) (citations omitted).

products to Xerox. *Id.* But he became convinced to do so after Portilla orally promised that Chung's new company would be the exclusive Paraguayan reseller of certain Xerox products. *Id.* ¶ 8. Portilla explained that Xerox already had one authorized reseller, a company called Docunet, S.A. ("Docunet"), but that Docunet distributed only high-volume photocopiers. *Id.* Hadami alleges that Portilla represented to Chung that if Chung closed Don Lorenzo and started a new company focused solely on Xerox products, then Chung's new company would be the exclusive reseller in Paraguay of low-volume office machines and parts—photocopiers, toner, and spare parts. Chung agreed and formed Hadami to be that new company. *Id.* ¶ 9. Chung then ceased operating Don Lorenzo. *Id.*

Hadami spent the next five years working to sell Xerox products in Paraguay. *Id.* ¶ 10. Hadami mainly purchased Xerox products from a Xerox-authorized distributor called Global Products Alliance ("GPA"), but negotiated incentives and rebates with Xerox directly. *Id.* ¶ 11. Hadami's business strategy was focused on winning bids for government contracts. *See id.* ¶¶ 14–17. To prevent against smuggling, the Paraguayan government requires bidders to submit letters of authorization from their products' manufacturers. *Id.* ¶ 12. From August 2009 to June 2014, Xerox issued approximately 12 such letters confirming that Hadami was an authorized dealer. *Id.* ¶ 13. Several named Hadami as an "authorized reseller." *See, e.g.,* Entin Aff. at 21, 79. Others stated that Hadami and Docunet were the *only* authorized resellers of Xerox goods in Paraguay. *See, e.g., id.* at 47, 69.

### 2. Grey Market Competitors

At some point, Hadami learned that other entities placing bids with the government were furnishing letters of authorization purporting to be from Xerox or its agents. FAC ¶ 15. These "grey market" entities included Alternativa, S.A. ("Alternativa") and Estilo de Artes Graficas ("EAG"). *Id.* ¶ 14. Hadami alleges that these companies' bids were so low that they must have been importing their products into Paraguay illegally. *Id.* As a result of their lower prices, the Paraguayan government began awarding contracts to these entities over Hadami. *Id.* ¶ 16.

Hadami notified Xerox that these entities were submitting inauthentic letters of authorization and requested that Xerox notify the Paraguayan authorities. *Id.* ¶ 17. In response, Xerox assured Hadami that it had not issued these letters and reiterated that Docunet and Hadami were its only authorized resellers. *Id.* ¶ 18. In a February 11, 2013 email, Xerox assured Hadami that it was "ready to intercede" with the government of Paraguay. *Id.* ¶ 19. On July 9, 2013, Hadami again wrote to Xerox to inform it that EAG had won several recent bids despite never declaring any legal imports to Paraguayan customs. *Id.* ¶ 20. Xerox wrote back that it would take care of Hadami "like a son." *Id.* ¶ 21. On July 30, 2013, Hadami again wrote to Xerox, seeking a "serious investigation," and stating that otherwise "legal suppliers [such as Hadami] are going to disappear." *Id.* ¶ 22. Xerox's Open Market MD Manager, Daniel Delepiani, allegedly again stated to Chung that "[Xerox had] not issued any letter authorizing these companies you mention." *Id.* ¶ 23.

On September 10 and 18, 2013, Xerox further assured Hadami via email that it was not doing and would not do business with any entities that engaged in illegal practices. *Id.* ¶ 24. On September 19, 2013, Xerox sent Hadami an email terming these entities "pirates" and stating that it was presenting to the Paraguayan government a letter "supporting Hadami and Docunet

as our Authorized Reseller [sic] for the country letting them know that [Xerox] products would only be guaranteed" if they bought from those two companies. *Id.* ¶ 25. Xerox asked Hadami to furnish copies of the purportedly fake authorization letters to it, to help Xerox identify the source. *Id.* ¶ 26. Throughout 2013 and 2014, Hadami provided import and sales records to Xerox demonstrating that Alternativa and EAG were selling more Xerox goods than they had declared to the authorities. *Id.* ¶ 28.

Eventually, Hadami told Xerox that it had no choice but to begin putting in bids below their costs in order to preserve market share. *Id.* ¶ 29. Xerox allegedly encouraged Hadami to do this, as well as to bring legal challenges against the grey market bidders. *Id.* ¶¶ 29–30. Hadami spent approximately $215,000 on such litigation, winning some challenges. *Id.* ¶¶ 30–31. Xerox congratulated Hadami on one victory. *Id.* ¶ 32.

### 3. Xerox Deceives Hadami By Supporting the Grey Market Dealers

Hadami alleges that from early on in its relationship with Xerox, Xerox was dishonest about the relationship it had with various grey market entities in Paraguay. In September 2014, Hadami allegedly became aware of Xerox's relationship with the grey market entities. *Id.* ¶ 50. Hadami alleges that the letters of authorization submitted to the government by the grey market entities, which Hadami had assumed were forged, were actually authentic. *Id.* ¶ 35. It alleges Xerox itself issued such letters on behalf of Alternativa in August and September 2014, *id.* ¶ 36, and that Xerox wholesalers issued such letters beginning in August 2012, *id.* ¶ 37.

Hadami also alleges that, in a March 15, 2013 email, Xerox "pledged its support" to several grey market dealers. *Id.* ¶ 38. Xerox allegedly knew these entities were violating Paraguayan law and undercutting Hadami's prices. *Id.* ¶ 39. On October 3, 2014, an employee of a Xerox distributor named Rodrigo Aguilar emailed Delepiani and warned him to be more careful about issuing authorization letters to grey and black market sellers. *Id.* ¶ 47. Later, Xerox entered into an agreement with Alternativa recognizing it as an authorized dealer. *Id.* ¶ 43. Hadami alleges that Alternativa obtained more than $650,000 worth of government contract awards that, without Xerox's help, would have gone to Hadami. *Id.* ¶ 46. The "scheme could not have worked ... without the direct [ ] support, coordination, economic power, and resources of Xerox." *Id.* ¶ 48. Hadami alleges that if Xerox genuinely did not approve of what was happening, it could have easily shut down the grey market. *Id.* ¶ 48.

### 4. The Three Letters

Before late 2014, Hadami and Xerox did not memorialize their agreements in writing, instead reaching their alleged contracts orally. *See id.* ¶ 52. On October 16, 2014, Xerox sent to Hadami the first of three letters purporting to appoint Hadami as an authorized reseller. *See id.* ¶ 52 & Ex. 1. Xerox sent another identical letter on December 2, 2014. *See id.* ¶ 52 & Ex. 2. Hadami signed both of the letters. *Id.* ¶ 54.[2]

Xerox also sent a different, undated letter, FAC, Ex. 3 (the "Undated Letter"), purporting to enroll Hadami in the "Bridge Program" as a "Xerox Business Partner." *Id.* ¶ 52 & Ex. 3. By its terms, the letter "confirm[ed] the appointment of

---

**2.** Alhough Xerox did not return a signed copy to Hadami, counsel for Xerox acknowledged at argument that the letters had been electronically signed and that Xerox considered itself bound by them. Tr. 31.

[Hadami] ... as a non-exclusive authorized reseller of Xerox corporation...." FAC, Ex. 3 at 1. The letter also provided that the agreement would be terminable at will with 90 days' prior written notice. *Id.* at 3. Hadami also signed this letter. FAC ¶ 54. In a supplemental filing with this Court after argument, Xerox submitted a copy of the same letter containing the signature of Eduardo Rodriguez, CFO of Xerox, dated July 2014. Dkt. 26.

### B. Procedural History

On July 18, 2016, Hadami filed the original complaint, invoking diversity jurisdiction, *see* 28 U.S.C. § 1332. Dkt. 1. On October 7, 2016, Xerox moved to dismiss. Dkts. 5–7. On October 28, 2016, Hadami filed the FAC, the operative complaint here, and attached the three 2014 letters as exhibits. Dkt. 11. On November 29, 2016, Xerox filed the pending motion to dismiss, Dkt. 18, along with, in support, the Declaration of Carolyn G. Nussbaum attaching the email referenced in FAC ¶ 38 and a translation that had been provided to her by counsel for Hadami, along with a brief in support, Dkt. 20 ("Def. Br"). On December 16, 2016, Hadami filed its brief in opposition, Dkt. 2, along with the Entin Affidavit, Dkt. 22, and its attached exhibits. On January 6, 2017, Xerox filed a reply brief. Dkt. 25 ("Def. Reply Br."). On February 17, 2017, Xerox submitted an additional declaration by Nussbaum attaching a version of Exhibit 3 to the FAC—the 2014 "Bridge Program Agreement" letter—signed by a Xerox representative. Dkt. 26. On February 3, 2017, the Court heard argument. On February 21, 2017, counsel for Hadami filed a response to Nussbaum's second declaration, Dkt. 27, and, on February 21, 2017, counsel for Xerox submitted, in response to Hadami's submission, a response and a Declaration of Daniel D. Delepiani as to how Xerox

discovered the signed letter in its files, Dkts. 28–29.

## II. Applicable Legal Standards

### A. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

In considering a motion to dismiss, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted)). However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *[f]actual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570, 127 S.Ct. 1955) (internal quotation marks omitted) (emphasis in *Arista Records* ). A complaint

is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558, 127 S.Ct. 1955.

### B. Rule 9(b)

To withstand a motion to dismiss, Hadami's state-law fraud claim must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *Dover Ltd. v. A.B. Watley, Inc.*, 423 F.Supp.2d 303, 317 (S.D.N.Y. 2006). Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy this Rule, a complaint alleging fraud must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) (internal quotations omitted). Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), the plaintiff must still "allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstan-

tial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

### III. Discussion

Hadami brings four claims: (1) breach of contract and of the implied covenant of fair dealing, FAC ¶¶ 59–64; (2) gross negligence, *id.* ¶¶ 65–68; (3) fraud, *id.* ¶¶ 69–73; and (4) tortious interference with prospective economic advantage, *id.* ¶¶ 74–77. Hadami seeks compensatory and punitive damages, as well as attorneys' fees. *Id.* at 14 ("Prayer for Relief").

Xerox argues for dismissal on various grounds, including that Hadami's alleged oral contract with Xerox is barred by the statute of frauds, that Xerox did not owe Hadami a duty of care required to state a claim for gross negligence, and that Hadami failed to plead fraud with the required level of particularity. The Court addresses these arguments in turn.[3]

### A. Breach of Contract

Hadami's breach of contract claim has three bases. First, Hadami alleges that Xerox breached an oral agreement with Hadami—under which Hadami would be Xerox's exclusive reseller in Paraguay of low-volume photocopiers, toner, and spare parts—by authorizing other entities to resell those same goods. FAC ¶ 60. Second, Hadami claims that Xerox breached the contract memorialized in the Undated Letter in several ways, such as by failing to provide Hadami with a fair sales and per-

---

3. The Court applies New York law to the contract and tort claims, because the three 2014 letters state that they are governed by New York law, *see, e.g.,* FAC ¶ 56 & Exs. 1–3, and because the parties have treated New York law as applicable, manifesting their assent to it. *See Cargill, Inc. v. Charles Kowsky*

*Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991); *see also Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 175 (2d Cir. 2000) ("Since no party has challenged the choice of New York ... law, all are deemed to have consented to its application.").

formance plan. *See id.* ¶ 62. Third, Hadami argues that Xerox breached the implied covenant of good faith and fair dealing. *Id.* ¶ 63. For the reasons that follow, none of these allegations states a claim against Xerox for breach of contract.

### 1. Breach of the Oral Agreement

■ Hadami claims that Xerox breached a 2009 oral agreement under which Hadami would be Xerox's exclusive reseller of low-volume office machines. Xerox counters that the statute of frauds bars enforcement of this agreement.

■ Under New York law, a cause of action for breach of contract requires "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Eternity Glob. Master Fund. Ltd.*, 375 F.3d at 177 (citation omitted); *see also Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804, 806, 921 N.Y.S.2d 260 (N.Y. App. Div. 2d Dep't 2011) (same). For an agreement to exist and be enforceable, it must satisfy the statute of frauds if it falls within the ambit of that statute. The statute of frauds requires that contracts that are incapable of being fully performed within one year be embodied in a writing setting forth the contract's material terms and signed by the party to be bound. *See* N.Y. Gen. Oblig. Law § 5–701(a)(1). When the parties agree that one or both has the "option to terminate their agreement within one year, that agreement is, by its own terms, capable of completion within that period and is not governed by the Statute [of frauds]." *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 483 N.Y.S.2d 164, 472 N.E.2d 992, 995 (1984). But, when the parties' oral agreement calls for performance over an indefinite duration, such that the agreement may be terminated in the first year only by a party's breach, then the agreement falls within the

statute of frauds and is unenforceable if not reduced to a writing. *Id.*; *see also Computech Int'l, Inc. v. Compaq Computer Corp.*, No. 02 Civ. 2628 (RWS), 2002 WL 31398933, at *3 (S.D.N.Y. Oct. 24, 2002) ("Under New York law, contracts of indefinite duration are deemed to be incapable of being performed *within a year*, and thus fall within the ambit of the Statute of Frauds.").

Here, as pled, the oral agreement appears to be either (1) as Xerox argues, of indefinite duration, falling within the statute of frauds, insofar as the parties did not contemplate an end date for Hadami's service as Xerox's exclusive low-volume office machine reseller, *see* FAC ¶ 8, or (2) as Hadami argues, terminable at will by either party, falling outside the statute of frauds. Either theory forecloses Hadami's breach of contract claim.

If the oral agreement was terminable at will, then Xerox terminated the contract when it allegedly permitted other resellers to sell the products Hadami thought were exclusive to it. Such conduct therefore would not constitute a breach.

■ If the agreement was of indefinite duration, then it falls within the statute of frauds, and, to be enforceable, required a writing satisfying that statute. There was none. The various letters of authorization from Xerox to the Paraguayan government do not, contrary to Hadami's claim, meet this standard. For a writing to satisfy the statute of frauds, "all the material terms of the agreement [must] be contained [in the writing] either expressly or by reasonable implication." *Hawley Fuel Coalmart, Inc. v. Steag Handel GmbH*, 796 F.2d 29, 33 (2d Cir. 1986) (quoting *Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 297 N.Y.S.2d 947, 245 N.E.2d 712, 715 (1969)); *see also Carruthers v. Flaum*, 450 F.Supp.2d 288, 308 (S.D.N.Y. 2006) (to satisfy statute of

frauds, "[t]he writing itself 'must designate all parties, identify and describe the subject matter and state all of the essential terms of a complete agreement'" (quoting *Wacks v. King*, 260 A.D.2d 985, 986, 689 N.Y.S.2d 298 (N.Y. App. Div. 3d Dep't 1999)). A material or essential term is one that "seriously affects the rights and obligations of the parties and there is a significant evidentiary dispute as to its content." *Ginsberg Mach. Co. v. J. & H. Label Processing Corp.*, 341 F.2d 825, 828 (2d Cir. 1965). The duration of an agreement is often a material term. *See id.* ("[T]he September 2 letter omits at least one essential term, the duration of the supposed exclusive."); *Artco, Inc. v. Kidde, Inc.*, No. 88 Civ. 5734 (MJL), 1994 WL 583172, at *4 (S.D.N.Y. 1994) ("The proffered writings ... fail under the Statute of Frauds because they do not contain an essential term of duration." (citing *Ginsberg Mach. Co.*, 341 F.2d at 828)).

Here, the various authorization letters Xerox sent to the Paraguayan government lack durational terms, and, because duration was a material term of the contract, fail to satisfy the statute of frauds. The durational length of an exclusivity agreement substantially affects the rights and obligations of both parties. This dispute reflects the point: Hadami argues that the contracts were at will while Xerox argues they were of indefinite duration. Hadami has not pointed to any other writing that supplies the missing durational term. Even the letters of authorization that explicitly refer to Hadami as an exclusive reseller, rather than just a reseller, do not contain any language indicating the length of that period of exclusivity. *See, e.g.*, Entin Aff. at 47, 69.[4] Because the writings put forward by Hadami lack a material term of the alleged oral agreement, they do not satisfy

the statute of frauds. The oral agreement is therefore void as a matter of law. It cannot serve as the basis for a breach of contract claim.

**2. Breach of the Undated Letter**

■ Hadami next claims that a variety of alleged breaches of the Undated Letter state a claim for breach of contract. This claim is not based on the exclusivity arrangement between Hadami and Xerox for low-volume light office machines, because the Undated Letter specifically states that Hadami will be a *"non-exclusive* authorized reseller" for Xerox. *See* Undated Letter at 1 (emphasis added). It is instead based on seven alleged lapses by Xerox that are claimed to breach the Undated Letter. These include "(i) failing to provide Hadami a fair sales and performance plan"; "(ii) failing to keep Hadami apprised of Xerox's genuine sales polices and programs"; "(iii) failing to provide training to Hadami's staff;" and, "(vii) by breaching the covenants of good faith and fair dealing to Hadami implied therein." *See* FAC ¶ 62 (listing the seven alleged breaches).

■ The FAC's allegations as to breaches of the Undated Letter do not state a claim for breach of contract because no breach is adequately pled. The allegations are entirely contained within one paragraph of the FAC, ¶ 62, and they are conclusory, factually inadequate claims of breach. "Conclusory allegations that a defendant breached an agreement are insufficient to support a breach of contract claim." *Frontline Processing Corp. v. Merrick Bank Corp.*, No. 13 Civ. 3956 (RPP), 2014 WL 837050, at *2 (S.D.N.Y. Mar. 3, 2014); *see also Berman v. Sugo LLC*, 580 F.Supp.2d 191, 202 (S.D.N.Y. 2008) (same; collecting cases). Hadami does no more than list terms in the Undated Letter and

**4.** At argument, counsel for Hadami conceded as much. Tr. 22 ("[W]e don't claim that [in

the oral agreement] there is a specific durational component.").

conclusorily allege that Xerox violated them. Such "naked assertions" of breach do not state a claim. *See Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, 842 F.Supp.2d 502, 513 (S.D.N.Y. 2012) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). To the extent Hadami's contract breach claim is based on the Undated Letter, the Court must dismiss this claim, too.

### 3. Breach of the Implied Covenant of Good Faith and Fair Dealing

Hadami alleges that Xerox breached the implied covenant of good faith and fair dealing in "each of its agreements with Hadami" because it behaved "in bad faith, dishonestly, and with the improper motive of denying Hadami its reasonably expected benefits" under the contracts. FAC ¶ 63.

Under New York law, a duty of good faith and fair dealing is implied in every contract, to the effect that neither party "shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (citing *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163, 167 (1933)). The implied covenant does not include any term inconsistent with the terms of the contractual relationship. But it includes promises that a "reasonable person in the position of the promisee would be justified in understanding were included" in the contract, and, when the contract involves the exercise of discretion, that the party promises "not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291–92 (1995) (citations omitted). The elements of a claim of breach of the implied covenant are similar to causes of action for breaches of duties of care, in that it requires the existence of a duty, breach of that duty, causation, and damages. *See Washington v. Kellwood Co.*, No. 05 Civ. 10034 (DAB), 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24, 2009).

Because the duties imposed by the implied covenant of good faith and fair dealing arise as a result of the formation of a contractual relationship between the parties, a claim for breach of the implied covenant of good faith and fair dealing must be dismissed when there is no valid and enforceable contract between the parties. *See, e.g., Randall's Island Aquatic Leisure, LLC v. City of New York*, 92 A.D.3d 463, 463–64, 938 N.Y.S.2d 62 (N.Y. App. Div. 1st Dep't 2012) ("There can be no claim of breach of the implied covenant of good faith and fair dealing without a contract.") (citation omitted). And, when a plaintiff claims a breach of the implied covenant of good faith and fair dealing based on the same facts as a breach of contract claim, the claim for the breach of the implied covenant must be dismissed as duplicative of the breach of contract claim. *See Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 70 A.D.3d 423, 426, 894 N.Y.S.2d 47 (N.Y. App. Div. 1st Dep't 2010) (citations omitted).

These principles require dismissal of Hadami's claim for breach of the implied covenant of good faith and fair dealing.

To the extent this claim is based on the 2009 alleged oral agreement by Xerox to make Hadami its exclusive reseller, the holding that this agreement was not enforceable bars a derivative claim for breach of the implied covenant.

To the extent that this claim is based on the three 2014 letter agreements, Hadami has not plausibly alleged a breach of a fairly implied duty. Hadami's claim is that Xerox breached the implied covenant both by authorizing other resellers, *see* FAC

¶¶ 35–40, and by encouraging Hadami to spend money litigating unlawful awards of government contracts, *id.* ¶¶ 29–32. As to the former, none of the 2014 letter agreements state that Hadami will be an exclusive reseller of Xerox products; on the contrary, the Undated Letter explicitly describes Hadami as a non-exclusive reseller of Xerox products. *See* FAC, Exs. 1–3. Because these letter agreements preclude any claim of any implied promise to Hadami of exclusivity, the authorization of resellers other than Hadami cannot be a breach. As to the latter, Xerox's encouragement for Hadami to litigate against other resellers based on unlawful awards of government contracts, *see id.* ¶¶ 31–32, that encouragement, as pled, did not deprive Hadami of the benefit of the 2014 letters. If anything, such litigation, if undertaken, had the potential to benefit Hadami, to the extent that success might have reduced competition from other resellers. *See id.* ¶ 31.

Hadami's claim for breach of the implied covenant of good faith and fair dealing therefore does not state a claim.

## B. Fraud

■ Hadami claims that Xerox defrauded it when Xerox, through its agents,[5] made statements to Hadami that led Hadami to believe that Xerox was not authorizing or supporting other sellers operating in the grey market. In fact, Hadami alleges, Xerox had authorized such sellers. And, Hadami alleges, it reasonably relied on Xerox's misleading statements to its detriment when it undertook litigation against those grey market entities. Those allegations make out a plausible claim of fraud.

■ Under New York law, to state a claim for fraud, a plaintiff must allege facts showing "that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Glob. Master Fund Ltd.*, 375 F.3d at 186–87 (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)). A claim for fraud must also satisfy Rule 9(b), which, as noted, requires the plaintiff to detail the fraudulent statements, identify the speaker, state when and from where the statements were made, and explain why the statements are fraudulent. *See id.* at 187. The allegations must also "give rise to a strong inference of fraudulent intent." *Acito*, 47 F.3d at 52.

■ New York law sets limits on the misrepresentations that may serve as the basis of a fraud claim. Several are relevant here. First, the misrepresentation must be of a "material existing fact." *Urstadt Biddle Props., Inc. v. Excelsior Realty Corp.*, 65 A.D.3d 1135, 1137, 885 N.Y.S.2d 510 (N.Y. App. Div. 2d Dep't 2009) (citing *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833, 835 (1958)). Second, a party's misrepresentation that it intended to perform under a contract does not support a claim for fraud. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) ("[I]ntentionally-false statements ... indicating [an] intent to perform under the contract ... [are] not sufficient to support a claim of fraud under New York law."). To maintain a claim for fraud separate from a breach of contract claim, a plaintiff

---

**5.** Hadami alleges that Xerox employees Daniel Delepiani and Eduardo Rodriguez, among others, made the allegedly fraudulent statements from New York, Florida, and Paraguay. *See* FAC ¶ 51.

must instead either "(i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Id.* at 20 (citations omitted). Fraud may not be pleaded in the alternative to a breach of contract claim, because "[i]t is well settled under New York law that a party cannot maintain overlapping fraud and breach of contract claims regardless of whether the alleged contract is unenforceable." *Maricultura Del Norte v. World Bus. Capital, Inc.*, 159 F.Supp.3d 368, 377 (S.D.N.Y. 2015) (alteration and quotation omitted).

Hadami's fraud claim here is that Xerox encouraged Hadami to initiate costly legal action in Paraguay against the grey market resellers to challenge the awarding to bids to those resellers, FAC ¶ 30, and that Hadami did so relying on Xerox's false representation that Xerox was not affiliated with the resellers whom Hadami pursued. *Id.* ¶ 32. Hadami pleads that it spent some $215,000 prosecuting challenges to government contract awards to resellers whom it understood to be unauthorized. *Id.* ¶ 30. Hadami won of these some cases and was congratulated by Xerox for those victories. *Id.* ¶ 31. But, Hadami alleges, contrary to Xerox's representation to Hadami that it did not support those resellers, in fact, Xerox had authorized and was authorizing these resellers to sell Xerox products in Paraguay, and these resellers (along with Xerox) gained sales as a result of Hadami's efforts and expenditures to promote Xerox's brand. *Id.* ¶ 33.

Hadami claims that in various communications Xerox represented to Hadami that it had not encouraged or authorized other resellers. In September 2013, Xerox asked Hadami to obtain copies of the grey market resellers' purported authorization letters so that Xerox "could discover who was issuing them and make clear to their distributors and the Paraguayan government that those companies were not authorized to trade in Xerox goods." *Id.* ¶ 26. Earlier in 2013, Xerox had represented to Hadami that Xerox had never issued authorization letters to grey market resellers and "reiterated that Hadami and Docunet were its sole authorized resellers in Paraguay." *Id.* ¶ 18. Later the same year, Xerox's Delepiani told Hadami's Chung that he wanted "to make it clear that we have not issued any letter authorizing these [grey market] companies you mention." *Id.* ¶ 23. Finally, Xerox reiterated the point on September 10 and 18, 2013, when it sent Hadami emails stating that it was not and would not do business with entities that sold products smuggled through the grey market. *See id.* ¶ 24.

In fact, Hadami alleges, these representations were untrue. At points before, during and after making them—including in 2012, 2013, 2014, and 2015—Xerox issued authorization letters to gray-market resellers, such as Alternativa, and encouraged them to sell Xerox products in Paraguay. *Id.* ¶¶ 35–39. Hadami alleges that Xerox benefited from this arrangement, which led to increased sales of its products; indeed, that Xerox offered bulk discounts to the grey market resellers. *Id.* ¶ 44.

This theory of fraud is cognizable. As pled, Xerox made a misrepresentation of fact (its claim not to be supporting the ostensibly unauthorized grey market resellers whom in fact Xerox had authorized) on which Hadami reasonably relied (by, with Xerox's encouragement, bringing legal action against those resellers) to its financial detriment. As alleged, Xerox benefitted from this double-dealing, insofar as it gained business from maintaining as resellers both the misled Hadami and the

grey market resellers. *Id.* ¶ 44. At the pleading stage, that motive, coupled with the claim of repeated false statements to Hadami, is a sufficient basis from which to infer fraudulent intent. And these allegations of fraudulent representations causing reasonable reliance—Hadami's legal fees—do not duplicate Hadami's dismissed contract claim. *See Maricultura Del Norte,* 159 F.Supp.3d at 378.

For clarity's sake, other alleged statements by Xerox, however, do not support a claim of fraud. For example, the claim that Xerox told Hadami that it would be Xerox's exclusive low-volume office machine reseller in Paraguay, *e.g., id.* ¶ 8, is impermissibly duplicative of Hadami's breach of contract claim. Also non-actionable are Xerox's statements that it was prepared to "intercede" with the Paraguayan government regarding the grey market resellers on behalf of Hadami and Docunet, *id.* ¶ 19, and that it would "take care of Hadami 'like a son,'" *id.* ¶ 21. These are statements of future intention that do not support a claim for fraud.

Accordingly, the Court denies Xerox's motion to dismiss Hadami's claim for fraud.

## C.  Gross Negligence

■ Hadami also brings a claim for gross negligence. *See id.* ¶ 67.

■ Under New York law, a claim for gross negligence requires establishing four elements: (1) the existence of a duty owed by the defendant to the plaintiff; (2) defendant's breach of that duty; (3) injury to the plaintiff caused by the defendant's breach; and (4) conduct by the defendant "that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *See American Tel. & Tel. Co. v. City of New York,* 83 F.3d 549, 555 (2d Cir. 1996) (quotation omitted). "[T]he duty giving rise to a gross negligence claim

must be independent of the duty arising from a contract." *Purchase Partners, LLC v. Carver Federal Sav. Bank,* 914 F.Supp.2d 480, 497 (S.D.N.Y. 2012).

Here, Hadami's theory of gross negligence is not sharply defined, but it appears to be that Xerox breached a duty to Hadami by not affirmatively taking steps to combat grey market trade in Paraguay. *Id.* ¶ 67 (claiming duty by Xerox "not to do anything to actively cause [Hadami] harm" and that Xerox acted with a "complete disregard for the rights and interests of Hadami").

■ Hadami fails to state a claim for gross negligence for various reasons. Most evidently, it fails to plead a relevant legal duty. Under New York law, there is no freestanding general duty of care to prevent a third party from causing injury to others. *See, e.g., McCarthy v. Olin Corp.,* 119 F.3d 148, 156 (2d Cir. 1997). And Hadami does not supply any authority imputing a duty of care to a manufacturer in its relationship with a reseller. Here, Xerox's duties to Hadami, as alleged, were those defined by oral and written contracts. Those contractual duties, however, cannot support a claim for gross negligence, as "claims based on negligent or grossly negligent performance of a contract are not cognizable." *Pacnet Network Ltd. v. KDDI Corp.,* 78 A.D.3d 478, 479, 912 N.Y.S.2d 178 (N.Y. App. Div. 1st Dep't 2010).

## D.  Tortious Interference with Prospective Economic Advantage

■ Finally, Hadami brings a claim for tortious interference with prospective economic advantage. Hadami alleges that Xerox intentionally interfered with Hadami's relationships and prospective advantages with its distributors and customers, namely, the Paraguayan government. FAC ¶ 75.

Hadami alleges that Xerox injured these relationships using "dishonest, unfair, and improper means," *id.*, and prevented it from winning bids to supply government contracts that it ought to have won as the only lawful importer of Xerox goods, *id.* ¶ 76.

This claim also must be dismissed.

Under New York law, a plaintiff suing for such tortious interference must prove that "(1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured." *Goldhirsh Grp., Inc. v. Alpert*, 107 F.3d 105, 108–09 (2d Cir. 1997). A claim of tortious interference with prospective advantage carries a higher burden than a claim of interference with an existing contract, as a plaintiff must show "more culpable conduct on the part of the defendant." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492, 496 (1996). "[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 785 N.Y.S.2d 359, 818 N.E.2d 1100, 1104 (2004).

Hadami's claim fails because it does not allege any wrongful conduct by Xerox directed at any third party with which Hadami had a prospective economic advantage. The FAC refers summarily to Hadami's "distributors, such as GPA," and its customers, such as "various departments of the government of Paraguay." FAC ¶ 75. But it pleads nothing more about these relationships. There is no well-pled allega-

tion that Xerox was motivated to harm Hadami in these relationships—on the contrary, Hadami pleads that Xerox was motivated by its desire "to increase the sale of its products." FAC ¶ 44. And there is no allegation that Xerox "directed ... activities towards the third party" so as to "convince the third party not to enter into a business relationship with the plaintiff." *B & M Linen Corp. v. Kannegiesser, USA, Corp.*, 679 F.Supp.2d 474, 485 (S.D.N.Y. 2010). There are no allegations that Xerox communicated with any of Hadami's distributors or with the Paraguayan government or that it contemplated any harm to Hadami from authorizing another reseller. Any injury to these relationships, as pled, was no more than an incidental byproduct of the fact that other resellers (besides Hadami and Docunet) were afoot. Hadami's allegations amount to no more than claims that Xerox "entered into relationships" with grey market resellers. These allegations alone are not "reasonably [ ] read to suggest that the target of [Xerox's] conduct was [Hadami's future] contractual arrangements with [third parties]," *see G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995). They do not suffice to plead this tort.

Accordingly, the Court grants Xerox's motion to dismiss Hadami's claim for tortious interference with prospective economic relations.

## CONCLUSION

For the foregoing reasons, Xerox's motion to dismiss is granted in part and denied in part. The Court dismisses Hadami's claims for breach of contract and of the implied covenant of good faith and fair dealing, for gross negligence, and for tortious interference with prospective economic advantage. The Court denies the motion to dismiss Hadami's claim for fraud.

Pursuant to the civil case management plan and scheduling order governing this action, Dkt. 17, fact discovery will end 270 days from today—the date of Court's resolution of Xerox's motion to dismiss. As such, the deadline to complete fact discovery is April 15, 2018. The Court also schedules a case management conference for May 15, 2018, at 3:30 p.m.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 5 and 18.

SO ORDERED.